UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
(Bangor Division)

| | |
|---|---|
| **KEVIN O'KEEFFE**<br><br>and<br><br>**SMARTBOARD, LLC,**<br><br>        **Plaintiffs,**<br><br>v.<br><br>**NORTHERN MAINE ORAL AND FACIAL SURGERY, INC.**<br><br>and<br><br>**AROOSTOOK UROLOGY, P.A. f/k/a AROOSTOOK UROLOGY, INC.**<br><br>        **Defendants.** | Case No. _____ |

## COMPLAINT

Plaintiffs Kevin O'Keeffe ("O'Keeffe") and SmartBoard, LLC ("SmartBoard") (collectively, "Plaintiffs") for their Complaint against Northern Maine Oral and Facial Surgery, Inc. ("NMOFS") and Aroostook Urology, P.A. f/k/a Aroostook Urology, Inc. ("Aroostook Urology") (collectively, "Defendants"), state as follows:

## PARTIES

1. O'Keeffe is an individual domiciled in Norfolk, Virginia.

2. SmartBoard is a Delaware limited liability company. Smartboard is a single member LLC owned by O'Keeffe that is without a principal place of business. At no time has

SmartBoard maintained its principal place of business in Maine. SmartBoard's "nerve center" is currently O'Keeffe's residence in Norfolk, Virginia.

3. Upon information and belief, NMOFS is a Maine corporation with its principal place of business in Presque Isle, Maine.

4. Upon information and belief, Aroostook Urology is an administratively dissolved Maine Corporation that last maintained a principal pace of business in Presque Isle, Maine.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the matter in controversy exceeds the sum of $75,000.

## FACTUAL BACKGROUND

I. **THE EMPLOYMENT AGREEMENT**

6. On or about June 3, 2008, Plaintiffs entered into an employment agreement (the "Employment Agreement") with NMOFS, Aroostook Urology, Dr. Imbesat Daudi ("Daudi"), and Dr. Henry Ford (collectively, the "Employer"). A true and accurate copy of the Employment Agreement is attached hereto as **Exhibit 1**.

7. The Employment Agreement lists O'Keeffe as the "Employee" under the opening paragraph of the Employment Agreement, but "Employee" is defined in the definitions section of the Employment Agreement as "both (either) the Employee and his professional practice SmartBoard, LLC." However, all work to be performed under the Employment Agreement was required to be, and actually was, performed by O'Keeffe. SmartBoard did not have the discretion to hire another person to perform the tasks required by the Employment Agreement.

8. Pursuant to the Employment Agreement, O'Keeffe was hired on a full-time basis as the "Chief Executive and Chief Financial Officer of current and future business entities and Financial Advisor to Partners." (Employ. Ag. at 1). "Partners" is defined to include "Northern Maine Pure Spring Water, LLC, Northern Maine Bottling Co., LLC, Northern Maine Restaurant & Brewery, LLC, D&F Enterprises, LLC, Aroostook Professional Properties, LLC, Northern Maine Commercial Properties, LLC, and such other companies which may exist in the future." (Ex. 1 at 1).

9. The term of the Employment Agreement is 10 years, which automatically renews for additional one-year terms at the end of the initial term until terminated in writing. (Ex. 1 at 2).

10. The Employer could terminate the Employment Agreement early by buying out Plaintiffs for the remainder of the pending term (Ex. 1 at 2).

11. The Employer could also terminate the Employment Agreement "if Employee is negligent in performance of his duties by failure to reasonably achieve ninety five (95) percent of Annual Plan as determined under GAAP principles for 2 consecutive years." (Ex. 1 at 3).

12. "Annual Plan" is defined in the Employment Agreement as:

the plan mutually determined by Employer and [Plaintiffs] for the various business entities owned in partnership by the Employer now existing or to come to exist in the future. Each year, in January, commencing in January, 2009, the Employer and [Plaintiffs] shall meet to review the position of the company, prior year results and to mutually determine the goals of the business entities for that year to include profitability and changes in Net Asset Value.

(Ex. 1 at 1).

13. Plaintiffs' compensation under the Employment Agreement was initially $5,000 per week, which increased to $6,000 per week after the one-year anniversary of the Employment Agreement. The Plaintiffs' compensation was to "increase annually thereafter by an amount equal to the [Consumer Price Index] for the year." (Ex. 1 at 3).

3

14. The Employment Agreement also provides the following bonus and equity grants to Plaintiffs:

> A bonus of 15% of the pretax profit and appreciation in Net Asset Value from the partnership enterprises payable annually, by mutual agreement in cash or equity, within ninety (90) days of the close of business for any given year. (1)
>
> An annual grant of 1% equity interest in the non medical practice assets and an option to purchase an additional 2 1/3% equity, exercisable for five years, granted annually and based upon the fair market value of the assets at the time of grant. (1)
>
> Note (1):  Bonus and gifted equity shall be subject to achievement of at least ninety five (95%) percent of annual plan.

(Ex. 1 at 3) (all weekly compensation, bonuses, and equity grants referred to hereafter as the "Compensation").  With respect to the bonus, it was agreed that Net Asset Value was to be "based upon appraisal paid by 3 parties."

15. Pursuant to the Employment Agreement, Plaintiffs' work week would "generally be 40 hours over four days" and Plaintiffs were required to "work for the Employer exclusively and shall not engage in any other work without the prior written consent of the Employer." (Ex. 1 at 3).  Plaintiffs were not given discretion of their work schedule and were required to mainly perform the Services of the Employment Agreement on site at the Defendants' offices.

## II. PERSONAL BANKRUPTCIES OF DAUDI AND FORD AND SHUT DOWN OF AROOSTOOK UROLOGY

16. On December 23, 2009, Ford filed a personal chapter 11 bankruptcy case before the United States Bankruptcy Court for the District of Maine (Case No. 09-11757).

17. On January 6, 2017, Ford received a discharge in his bankruptcy case.

18.  Despite being aware of the obligations under the Employment Agreement, Ford did not list Plaintiffs as creditors in his personal bankruptcy case.

19. On December 23, 2009, the same day as Ford, Daudi filed a personal chapter 11 bankruptcy case before the United States Bankruptcy Court for the District of Maine (Case No. 09-11755).

20. On January 6, 2017, Daudi received a discharge in his bankruptcy case.

21. Despite being aware of the obligations under the Employment Agreement, Daudi did not list Plaintiffs as creditors in his personal bankruptcy case.

22. Upon information and belief, at all relevant times Daudi was the sole owner of Aroostook Urology.

23. Upon information and belief, in or around 2011, Daudi ended the operations of Aroostook Urology.

24. On August 28, 2017, Aroostook Urology became administratively dissolved for its failure to file annual reports.

25. Upon information and belief, neither before or after Aroostook Urology's dissolution did Plaintiff receive any written notice from Aroostook Urology regarding a deadline to assert a claim against it.

26. Plaintiffs are unaware of any notice published by Aroostook Urology regarding its dissolution and/or a deadline to assert a claim against it.

27. On or about April 18, 2012, Daudi, in his individual capacity, sent a letter to O'Keeffe stating that he would no longer require O'Keeffe's services. However, Aroostook Urology never sent any written correspondence to the Plaintiffs terminating the Employment Agreement.

### III.  NMOFS ATTEMPTS TO RENEGOTIATE THE EMPLOYMENT AGREEMENT

28. Upon information and belief, prior to Aroostook Urology shutting down, the source of Plaintiffs' salary was split evenly between Aroostook Urology and NMOFS.

29. After Aroostook Urology shut down, NMOFS attempted to renegotiate the Employment Agreement.

30. NMOFS wished to pay Plaintiffs significantly less than was provided for in the Employment Agreement, while providing essentially nothing in return for such changed terms.

31. NMOFS still required that Plaintiffs work the same four days, 40-hour work week as was provided for in the Employment Agreement, while now exclusively providing services to NMOFS and/or as otherwise directed by Ford/NMOFS.

32. Drafts of potential amendments to the Employment Agreement were circulated, but the parties never reached an agreement to amend the Employment Agreement.

33. The parties never signed an amendment or modification to the Employment Agreement.

34. There was never an oral agreement between the parties to amend or modify the Employment Agreement.

35. Accordingly, the Employment Agreement is the only signed agreement between the parties and continues to control the rights and obligations of the Plaintiffs, NMOFS, and Aroostook Urology.

### IV.  NMOFS' SUSPENSION OF PLAINTIFFS

36. The Plaintiffs were orally suspended from NMOFS during a meeting on or around July 13, 2016 (the "Suspension Meeting").

37.     At the Suspension Meeting, Plaintiffs were told that they were being suspended due to improperly taking money from NMOFS.[1]

38.     Upon information and belief, as of the filing of this Complaint, NMOFS has not provided Plaintiffs with written notice that they have been terminated by NMOFS.

## V.     COMPENSATION OWED TO PLAINTIFFS

39.     Plaintiffs calculate that between September 20, 2015 until the end of the initial term of the Employment Agreement, they were to be paid weekly base compensation in the amount of approximately $946,363.15.

40.     Upon information and belief, even taking into account all payments alleged by NMOFS to have been received by Plaintiffs (whether proper or improper) as compensation for the period September 20, 2015 to the present, Plaintiffs would still be owed in excess of $700,000 in weekly base compensation for the initial term of the Employment Agreement.  Upon information and belief, the compensation owed to Plaintiffs for the initial term of the Employment Agreement is greatly in excess of $700,000.

41.     In addition to failing to pay Plaintiffs their weekly base compensation, NMOFS also failed to provide Plaintiffs any of the bonuses or equity grants provided for in the Employment Agreement at any time from September 20, 2015 to the present.

42.     Upon information and belief, while the bonuses and equity grants were contingent upon meeting certain requirements in an "Annual Plan", despite numerous requests by O'Keeffe, no Annual Plans were established by Defendants.

---

[1] In or about March 2021, O'Keeffe was served with an indictment from the State of Maine charging him with "Theft by Deception" pursuant to 17-A M.R.S.A. § 354, in connection with the alleged improper taking of money from NMOFS.  O'Keeffe denies that he has improperly taken money from NMOFS.

43. Accordingly, O'Keeffe has met the requirements of all applicable Annual Plans, as no requirements were ever set.

44. Finally, NMOFS has failed to provide Plaintiffs with health benefits since approximately mid-2016.

45. Aroostrook Urology has provided no form of compensation or health benefits to Plaintiffs from September 20, 2015 to the present.

## VI.   NOTICE OF NON-PAYMENT OF WAGES

46. On or about August 12, 2021, Plaintiffs sent correspondence to Defendants requesting payment of all potentially outstanding amounts owed to Plaintiffs within eight days of receipt of the correspondence (the "Demand for Payment").  A copy of the Demand for Payment is attached hereto as **Exhibit 2**.

47. Counsel for Plaintiffs received correspondence back from NMOFS and Daudi denying any duty to pay additional wages or other compensation to Plaintiffs.

### COUNT I: Breach of Contract

48. Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

49. The Employment Agreement is a binding and enforceable contract between Plaintiffs and Defendants.

50. Plaintiffs have fully performed all of their obligations under the Employment Agreement, to the extent they have been allowed by Defendants to do so.

51. Plaintiffs are not in breach of the Employment Agreement.

52. The Defendants' failure to pay all Compensation due to Plaintiffs pursuant to the Employment Agreement from September 20, 2015 to the present[2] is a breach of the Employment Agreement.

53. The Defendants' failure to provide health benefits to Plaintiffs at all times from approximately 2016 to the present is a breach of the Employment Agreement.

54. As a result of Defendants' breaches of the Employment Agreement, Defendants have been damaged in an amount greater than $700,000 in weekly base compensation (with such amount being substantially more to the extent it be determined that certain payments received by Plaintiffs were not compensation pursuant to the Employment Agreement), plus such amounts as determined by the Court with respect to bonuses, equity grants, and health care benefits. Since the end of the initial term of the Employment Agreement, Defendants have been damaged in an additional amount of no less than $1,454,758.61 in weekly base compensation as of the date of filing this Complaint (for a total combined weekly base compensation damages greater less than $2,154,758.61), plus such amounts as determined by the Court with respect to bonuses, equity grants, and health care benefits.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants, jointly and severally, in an amount to be determined at trial equal to all unpaid Compensation and health care benefits, and for such other and further relief as is just.

### Count II:  Violation of 26 M.R.S.A. §§ 621-A and/or 626 and Claim Pursuant to 26 M.R.S.A. § 626-A

55. Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

---

[2] Plaintiffs seek damages not only through the end of the initial term of the Employment Agreement (June 2018), but instead seek damages through to the present as, upon information and belief, Plaintiffs have not received written notice from Defendants of their intent to terminate the Agreement, and the Agreement continues to renew for one-year terms until terminated in writing by the Defendants. (Ex. 1 at 2).

56. Pursuant to 26 M.R.S.A. § 621-A, "[a]t regular intervals not to exceed 16 days, every employer must pay in full all wages earned by each employee."

57. Plaintiffs remain employees of Defendants since they have not received written termination from the Defendants in accordance with the terms of the Employment Agreement.

58. Plaintiffs have received no payments from Defendants from approximately mid-2016 to the present in violation of 26 M.R.S.A. § 621-A.

59. Pursuant to 26 M.R.S.A. § 626, "[a]n employee leaving employment must be paid in full no later than the employee's next established payday."

60. In the alternative, to the extent it is determined that Plaintiffs are no longer employees of Defendants, Plaintiffs were not paid in full under the Employment Agreement on or before their next established payday after their employment was ended in violation of 26 M.R.S.A. § 626.

61. Pursuant to 26 M.R.S.A. § 626-A, due to Defendants' failure to pay wages and provide health benefits when due, Plaintiffs are entitled to "in addition to the unpaid wages or health benefits adjudged to be due, a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages."

62. Plaintiffs have provided Defendants with more than 8 days' notice of the outstanding wages, as required by 26 M.R.S.A. § 626-A.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants, jointly and severally, in an amount to be determined at trial equal to all unpaid Compensation and health benefits plus a reasonable rate of interest, costs of suit including a

reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid Compensation, and for such other and further relief as is just.

Submitted this  21st  day of September, 2021.

                                        Respectfully submitted,

                                        /s/ Jon A. Haddow
                                        Jon A. Haddow
                                        Farrell, Rosenblatt & Russell
                                        61 Main Street
                                        P.O. Box 788
                                        Bangor, ME 04402-0738
                                        Tel: (207) 990-3314
                                        jah@frrlegal.com

                                                    and

                                        Jonathan Grasso (to be admitted *pro hac vice*)
                                        Pierce McCoy, PLLC
                                        31 West 34th Street, Suite 8065
                                        New York, NY 10001
                                        Tel: (212) 369-8080
                                        jon@piercemccoy.com

                                        *Counsel for Kevin O'Keeffe and Smartboard, LLC*